# UNITED STATES COURT OF APPEALS FOR VETERANS CLAIMS

No. 16-1537

WALTER G. LONG, APPELLANT,

V.

ROBERT L. WILKIE,
SECRETARY OF VETERANS AFFAIRS, APPELLEE.

On Appeal from the Board of Veterans' Appeals

(Argued August 28, 2019                    Decided December 30, 2020)

*Jenna E. Zellmer*, with whom *Shawn D. Murray* was on the brief, both of Providence, Rhode Island, for the appellant.

*Ronen Z. Morris*, with whom *Megan Flanz*, Interim General Counsel; *Mary Ann Flynn*, Chief Counsel; *Kenneth A. Walsh*, Deputy Chief Counsel; and *Lance P. Steahly*, were on the brief, all of Washington, D.C., for the appellee.

Before BARTLEY, *Chief Judge*, and PIETSCH, GREENBERG, ALLEN, MEREDITH, TOTH, and FALVEY, *Judges*, and DAVIS and SCHOELEN, *Senior Judges*.[1]

TOTH, *Judge*, filed the opinion of the Court. SCHOELEN, *Senior Judge*, filed an opinion concurring in the judgment and dissenting in part. MEREDITH, *Judge*, filed a dissenting opinion, in which GREENBERG and ALLEN, *Judges*, joined.

TOTH, *Judge*: Air Force veteran Walter G. Long appealed the Board's decision not to refer his noncompensable bilateral hearing loss rating for extraschedular consideration. Specifically, he claims that the Board erred by not explaining how the diagnostic criteria for hearing loss contemplated the various symptoms and effects he experienced, including: anxiety and depression, reduced self-esteem, inability to understand spoken conversations without hearing aids, difficulty hearing in meetings, and ear pain resulting from his use of hearing aids.

We thank Mr. Long for his patience throughout multiple stays and a lengthy en banc process; nonetheless, we affirm the Board decision because the symptomatology he presents is not exceptional, as it is readily capable of evaluation under the relevant diagnostic criteria and

---

[1] Judges Davis and Schoelen are Senior Judges acting in recall status. *In re Recall of Retired Judge*, U.S. VET. APP. MISC. ORDER 04-20 (Jan. 2, 2020); *In re Recall of Retired Judge*, U.S. VET. APP. MISC. ORDER 03-20 (Jan. 2, 2020).

available rating tools. Thus, there was no error in the Board's ruling that referral for extraschedular consideration was not warranted under 38 C.F.R. § 3.321(b)(1).

## I. BACKGROUND

Walter G. Long served in the Air Force from 1969 to 1976. R. at 394, 675. He spent much of that time as an air traffic control radar repairman, working without ear protection in close proximity to active runways. R. at 675-76. In 2009, he filed a claim for service connection for his resulting hearing loss. R. at 690. VA granted his claim and assigned a noncompensable rating based on the results of an audiological examination. R. at 625

He appealed that decision but did not contest that the schedular rating criteria directed a noncompensable rating; instead, he asked the Board to refer his claim for extraschedular consideration because he experienced certain functional effects of hearing loss not contemplated by the schedular rating criteria. R. at 36. Mr. Long asserted that the mechanical nature of the criteria (essentially audiometric test results applied to rating tables comprised of Roman numeral values) rendered them inadequate because they failed to account for the functional effects of his hearing loss.[2] R. at 38. These included: anxiety and depression symptoms, decreased self-esteem and personal satisfaction, problems with speech discrimination not helped by hearing aids, interference with his ability to work with his students, increased difficulty writing lesson plans and preparing for classes, and ear pain resulting from the use of hearing aids. *See generally* R. at 401-25. Finally, despite undergoing a VA examination, Mr. Long was not diagnosed with a psychiatric disorder recognized by the fifth edition of the *Diagnostic and Statistical Manual of Mental Disorders* (DSM-5) in relation to these complaints.

As to his anxiety and depression symptoms, the Board cited a 2011 VA clinical psychologist's determination that Mr. Long's mental health issues were less likely than not related to hearing loss. R. at 501. The psychologist noted that, when discussing his symptoms of depression, the veteran did not mention hearing loss but consistently referred to marital and interpersonal difficulties, alcoholism, and a family history of mental health issues that made him

---

[2] Our prior decisions have explained in detail how the rating criteria for hearing loss operate, and so we need not do so here again at length. *See, e.g.*, *Rossy v. Shulkin*, 29 Vet.App. 142, 144 (2017); *Doucette v. Shulkin*, 28 Vet.App. 366, 368 (2017). In short, the rating criteria are characterized as mechanical because, instead of listing symptoms, results of audiometric tests are applied to rating tables comprised primarily of Roman numeral values. *See generally* 38 C.F.R. §§ 4.85and 4.86 (2020).

vulnerable to psychiatric manifestations as an adult. *Id*. The Board found Mr. Long not competent as a lay person to offer a competing opinion as to the etiology of his depression and anxiety. R. at 7. On balance, the Board found that the medical evidence did not otherwise support such a connection. It also noted that he never appealed earlier decisions in which VA denied service connection for these conditions, including as secondary to hearing loss. *Id.*

As to speech discrimination, the Board noted that hearing loss evaluations hinge "on a mechanical application of specifically defined regulatory standards" and that it was clear that the need to wear hearing aids was simply "not a factor in the evaluation for hearing impairment" under such criteria. R. at 7.

For his work-related difficulties, the Board noted Mr. Long's ability to work with students, write lesson plans, and prepare for classes. R. at 8. It found that both VA examiners fulfilled their duty to "fully describe the functional effects caused by a hearing disability" beyond merely noting the results of the hearing test. *Id.*; *see Martinak v. Nicholson*, 21 Vet.App. 447, 455 (2007) (outlining examiners' duties). To that end, the 2009 VA examiner noted that people had to repeat themselves to Mr. Long and that he had difficulty in meetings, while the 2014 VA examiner concluded that he needed hearing aids but would not be otherwise limited in the work environment. R. at 121, 389. The Board also considered whether the 2011 private examiner included any such information but found only a notation that Mr. Long's hearing had decreased since his last evaluation. R. at 8.

Ultimately, the Board concluded that the evidence did not present an unusual or exceptional disability picture because the rating criteria reasonably described his disability level and symptomatology. R. at 9. It found no indication that he lost considerable time at work or experienced frequent hospitalization due to his hearing loss. *Id.* Further, any interference with his ability to work with his students or prepare lesson plans was proportional to the severity of his hearing loss. *Id.* Thus, the Board found that application of the regular schedular standards was not impractical and referral for further consideration was not warranted. *Id.*

## II. ANALYSIS

The Board's findings that the veteran has not presented an exceptional disability picture because the rating criteria reasonably described his disability level and symptomatology are factual determinations reviewed under the "clearly erroneous" standard of review. *See Chudy v. O'Rourke*,

30 Vet.App. 34, 38 (2018); *see also Kuppamala v. McDonald*, 27 Vet.App. 447, 454 (2015) (characterizing the Director of Compensation's assessment as a "fact-driven analysis"). A finding is "clearly erroneous" when, although there is evidence to support it, the Court is convinced on review of the entire evidence that a mistake has been made. *Miller v. Wilkie*, 32 Vet.App. 249, 254 (2020).

## A. Exceptionality and Extraschedular Analysis

To warrant referral for extraschedular consideration, a disability must be so exceptional or unusual that it renders application of the regular schedular ratings impractical. 38 C.F.R. § 3.321(b)(1) (2020). By its very nature, an "exceptional" or "unusual" disability defies easy classification, and so it has been an enduring challenge to fashion a standard sufficiently flexible to allow for individualized consideration of truly unusual impairments but not so expansive as to effectively discard the "exceptionality" requirement. In *Thun v. Peake*, 22 Vet.App. 111, 115 (2008), we spelled out a general standard for determining whether a veteran's disability is exceptional or unusual under § 3.321(b)(1). Known as *Thun*'s "first step," it requires adjudicators to compare "the level of severity and symptomatology of the claimant's service-connected disability with the established criteria found in the rating schedule for that disability." *Id*. If "the criteria reasonably describe the claimant's disability level and symptomatology, then the claimant's disability picture is contemplated by the rating schedule" and the schedular evaluation is adequate and "no referral is required." *Id.*

Significantly, we have consistently declined to treat *Thun*'s first step as a mechanical test that is satisfied whenever a veteran presents a symptom not expressly listed in the diagnostic code. This makes sense, as *Thun* sought merely to interpret what § 3.321(b)(1) means by "exceptional" cases; it never intended to displace the regulation with a more lenient, court-created, standard whereby anything not expressly listed in a diagnostic code is automatically deemed exceptional.

Thus, in *Doucette v. Shulkin*, 28 Vet.App. 366, 369 (2016), we held that the rating criteria for hearing loss contemplated symptomatology (i.e., the full range of symptoms) related to decreased hearing, even though the diagnostic code failed to list any symptoms but relied solely on audiometric tests. Further, the Court expressly rejected the same line of argument Mr. Long raises here, namely that the mere absence of alleged symptoms and effects from the diagnostic criteria suffices to satisfy *Thun's* first step. In rejecting this argument, *Doucette* cautioned that reading *Thun*'s first step too rigidly would have the adverse effect of requiring the Board to engage

in extraschedular analysis in *all* hearing loss cases, a result directly at odds with the stated intent of the rating criteria—to compensate veterans for the average loss of earnings capacity that results from a disability. *Id* at 371.

Here, we break no new ground in holding that exceptionality remains the touchstone in determining whether extraschedular consideration is warranted under § 3.321(b)(1) and that *Thun*'s first step is satisfied only when a veteran presents symptoms that are truly unusual or exceptional. Further, because the determination of whether a veteran presents exceptional symptomatology is, by nature, fact-bound and highly contextual, *Thun*'s first step should be approached as a totality of the factors inquiry rather than as a mechanical formula. Properly framed, *Thun*'s first step centers on whether the veteran's disability picture as a whole—that is, the full symptomatology—presents an impairment that is so exceptional that the rating schedule is not capable of assessing it in the first instance. This inquiry is not reducible to a mere comparison between symptoms and the diagnostic criteria but requires a reasoned assessment of both the veteran's full disability picture and the capacity of the rating schedule to evaluate such.

This is the exact approach we took in *Doucette*. There, rather than engaging in a line-item accounting of each symptom and effect as compared to the diagnostic criteria, we based our ruling on the common-sense observation that a diagnostic code designed to assess hearing loss necessarily contemplates those symptoms and effects commonly associated with such. Nonetheless, we cautioned against an overly broad reading that would foreclose extraschedular relief where the veteran did, in fact, present exceptional symptoms. For demonstrative purposes, we listed examples of symptoms that may prove exceptional in certain cases. *Doucette*, 28 Vet.App. at 371.

*Doucette* thus employed no magic formula in concluding that the diagnostic criteria for hearing loss contemplated the veteran's symptomatology and so failed to satisfy *Thun*'s first step; instead, the Court considered the veteran's full disability picture and drew reasonable inferences about the ability of the rating criteria to evaluate it. Because the veteran's various complaints were "precisely the effects that VA's audiometric tests are designed to measure," *id*. at 369, they could not be deemed exceptional.

### B. Some Factors for Consideration

While we reemphasize that *Thun*'s first step operates as a broad, totality-of-factors inquiry, we nonetheless offer some guiding principles, gleaned from various decisions of this Court and

the Federal Circuit, that sharpen the focus as to how to recognize whether symptomatology is exceptional under § 3.321(b)(1). We offer this guidance with a note of caution, that the following is not an exhaustive list of mandatory factors but should be considered as guiding considerations in determining whether a veteran's symptomatology is "exceptional" under *Thun*'s first step.

*First*, the sole focus of *Thun*'s first step is on the ability of the rating schedule to evaluate any impairment manifested by the veteran's symptomology. Thus, a veteran's symptomology is exceptional under 38 C.F.R. § 3.321(b)(1) when it is of such nature or severity that conventional rating tools are not adequate to evaluate it properly. Extraschedular consideration is simply not applicable to claims that are evaluated properly but ultimately denied under the schedular ratings; it applies only after conventional rating tools prove inadequate to evaluate a veteran's symptomatology in the first place due to its exceptional nature. Thus, the "rating schedule must be deemed inadequate *before* extraschedular consideration is warranted." *Sowers v. McDonald*, 27 Vet.App. 472, 478 (2016) (emphasis added).

For this reason, we held in *Morgan v. Wilkie*, 31 Vet.App. 162, 168 (2019), that extraschedular consideration is appropriate only after the agency has exhausted all other tools for a disability rating, whether direct, secondary, or analogous ratings. We noted that focusing "on the full scope of schedular rating devices will significantly reduce the need to address extraschedular referral, reserving it for those cases that are truly 'exceptional.'" *Id*. As such, "exceptionality"—as interpreted via *Thun*'s first step—must be viewed in the context of all available rating tools and cannot be reduced to a mere comparison of a veteran's symptomatology with the language of a particular diagnostic code. *See*, *e.g.*, *Spellers* v. *Wilkie*, 30 Vet.App. 211, 218 (2018). A symptom cannot be deemed exceptional (and so satisfy *Thun*'s first step) where it is capable of evaluation by conventional rating means.

*Second*, as the basis of any disability evaluation, functional impairments serve as the operative focus of *Thun*'s first step. *See* 38 C.F.R. § 4.10 (2020). In *Saunders v. Wilkie*, 886 F.3d 1356, 1362 (Fed. Cir. 2018), the Federal Circuit noted that in veterans law, the "term 'disability' refers to a condition that impairs normal functioning and reduces earning capacity." By contrast, the term "functional effects" pertains to an examiner's obligation to describe a veteran's disability picture in full, and that term has never carried a central role within VA's compensation system— as evidenced by its absence from statute or regulation. *See Martinak*, 21 Vet.App. at 455 (discussing the duties of examiners conducting hearing evaluations).

6

For this reason, we echo our earlier precedent treating functional effects as relevant to *Thun*'s second step, which examines whether the veteran's exceptional symptomatology causes "marked interference with employment," "frequent periods of hospitalization," or other related factors. § 3.321(b)(1). Underscoring the distinction between symptoms and effects, we noted in *Yancy v. McDonald* that "the first *Thun* element compares a claimant's symptoms to the rating criteria, while the second addresses the resulting effects of those symptoms." 27 Vet.App. 484, 494 (2016). Likewise, in *Thun* we noted that evidence of a claimant's lost income "might be relevant" to the second step "but unequivocally is not part of" the first step. 22 Vet.App. at 117 n.3; *see also Anderson v. Shinseki*, 22 Vet.App. 423, 429 n.2 (2009) (noting that the "loss of hypothetical employment advancement opportunities and an inability to work . . . have little relevance to the threshold inquiry into the adequacy of the rating schedule.").

*Third*, we draw attention to our recent holding in *Martinez-Bodon v. Wilkie*, 32 Vet.App. 393, 404 (2020), that a valid DSM-5 diagnosis is required to compensate a psychiatric disability. Thus, a veteran's complaints about various psychological or emotional difficulties that may be associated with a separate disability generally would not constitute a valid diagnosis of a mental health disorder. This applies equally in contexts where a veteran seeks referral for extraschedular consideration to obtain an increased rating for an existing service-connected disability. Whether a symptom or impairment is compensable under the rating schedule is a different inquiry than whether a service-connected condition is *adequately* compensated. Accordingly, where alleged psychological conditions are not compensable in the first instance due to the lack a formal diagnosis, they do not warrant extraschedular consideration as this would amount to a backdoor means to obtaining compensation for conditions the rating schedule intends to exclude.

*Fourth*, extraschedular consideration does not provide an exception to the rule that a disability is not compensable if it "cannot be attributed to an 'injury' or a 'disease' incurred or aggravated in the line of duty." *Terry v. Principi*, 340 F.3d 1378, 1382 (Fed. Cir. 2003) (discussing 38 U.S.C. §§ 1110 and 1131). Extraschedular ratings are no different from their schedular counterparts insofar as they are "meant to compensate only service-connected disabilities." *Langdon v. Wilkie*, 32 Vet.App. 291, 298 (2020). Thus, consideration is not warranted for downstream effects that clearly lack a requisite and legally recognized nexus to service or to a service-connected disability.

*Fifth*, the Board need only discuss "possible schedular alternatives for rating a disability" if they are "raised by the claimant or reasonably raised by the record." *Morgan*, 31 Vet.App. at 168. The requirement to assess whether a veteran's symptomatology is exceptional does not require it "to raise and reject 'all possible' theories of entitlement." *Robinson v. Peake*, 21 Vet.App. 545, 553 (2008), *aff'd sub nom. Robinson v. Shinseki*, 557 F.3d 1355 (Fed. Cir. 2008). Extraschedular consideration requires a reasoned assessment of the veteran's disability picture in its full complexity; it is not an impossible quest to uncover matters only hinted at by the record. *See id.* at 555 ("It is impractical to require the Board to explicitly mention every prior medical record noting any type of symptom and state that there is no evidence that the symptom is directly connected to the current condition.").

*Finally*, as a creature of regulation, extraschedular consideration does not provide an exception to the court's duty under 38 U.S.C. § 7261(c)(2) to "take due account of the rule of prejudicial error." *See Simmons v. Wilkie*, 30 Vet.App. 267, 279 (2018). For example, in *Payne v. Wilkie*, 31 Vet.App. 373, 394 (2019), we held that a veteran who failed to raise an argument that *Thun*'s second step was met failed to demonstrate prejudice from any error in the Board decision. Thus, a failure on the Board's part to discuss whether extraschedular consideration is warranted for a given symptom does not require an automatic remand.

## C. Mr. Long's Case

At last, we turn to Mr. Long's case. He alleges that the diagnostic criteria for hearing loss fail to account for his varied symptoms and effects, including: anxiety and depression symptoms; decreased self-esteem and personal satisfaction, problems with speech discrimination not helped by hearing aids, interference with his ability to work with his students, increased difficulty writing lesson plans and preparing for classes, and ear pain resulting from the use of hearing aids. *See generally* R. at 401-25.

As already discussed, in *Doucette* we held that "the rating criteria for hearing loss contemplate the functional effects of decreased hearing and difficulty understanding speech in an everyday work environment, as these are precisely the effects that VA's audiometric tests are designed to measure." 28 Vet.App. at 369. *Doucette* issued after briefing began in this case, and Mr. Long concedes that its holding applies to some of his symptoms—namely his limited ability to hear the television or conversation without hearing aids or to understand speech in the presence of background noise. Reply Br. at 1-2.

8

Because Mr. Long's hearing-related symptoms are clearly covered by *Doucette*, we find no error in the Board's ruling that the rating criteria for hearing loss contemplated such issues.

At the heart of this case is his remaining contention, that the Board was required to explain how the mechanical nature of the rating criteria for hearing loss contemplate the various functional effects that he experiences beyond the "inability to hear or understand speech or to hear other sounds in various contexts." *Doucette,* 28 Vet.App. at 369. These effects, per the veteran, include difficulty establishing and keeping relationships, reduced self-esteem and personal satisfaction, and various work-related difficulties such as interacting with students and writing lesson plans. He contends that the "Court explicitly placed such effects outside the subset of 'functional effects of difficulty hearing and understanding speech' that the rating criteria contemplate." Reply Br. at 2 (quoting *Doucette*, 28 Vet.App. at 371).

### 1. Reduced Self-esteem and Personal Satisfaction

Insofar as his complaints of reduced self-esteem and social impairment suggest psychiatric disabilities, there's no indication, let alone argument, that these conditions cannot be adequately evaluated under VA's General Rating Formula for Mental Disorders. That rating formula expressly contemplates, among other things, "social impairment." 38 C.F.R. § 4.130 (2020). As we stated clearly above, a disability cannot be deemed exceptional where it is capable of evaluation by conventional rating means.

What's more, there is nothing in the record to suggest that Mr. Long's self-esteem-related allegations comprise a mental disability warranting compensation. If the requirement to show a valid DSM-5 diagnosis is an obstacle to compensation, *see Martinez-Bodon*, 32 Vet.App. at 404, extraschedular compensation for hearing loss (or any other service-connected disability) is not a path around it. The Board did not err in declining to consider whether extraschedular consideration was warranted for those conditions.

### 2. Anxiety and Depression

The same result applies to Mr. Long's arguments regarding anxiety and depression. He does not take issue with the Board's finding that the only competent and probative medical evidence of record attributed these conditions to marital and interpersonal difficulties, alcoholism, and a family history of mental health issues—not to hearing loss. Nor does he suggest that his alleged anxiety and depression were not capable of evaluation under the diagnostic codes relevant to mental disabilities. *See, e.g.*, 38 C.F.R. § 4.130, Diagnostic Codes 9413 (unspecified anxiety

disorder) and 9435 (unspecified depressive disorder). Indeed, these are recognized disabilities with their own diagnostic codes and well-established means for compensation, and the Board noted that VA had already evaluated his anxiety and depression separately under the appropriate schedular rating criteria for these disabilities. *See* R. at 452–53 (2011 rating decision denying service connection for anxiety and depression).

Again, where a disability proves capable of evaluation by conventional means, it cannot be deemed exceptional. And the mere fact that Mr. Long's conditions were not, according to VA's initial determination, recognized as compensable under the criteria specifically designed to evaluate psychiatric disorders is not enough to trigger extraschedular consideration.

Additionally, there is no evidence linking his anxiety and depression to his hearing loss. He never described these impairments within the context of hearing loss, nor did any examiner associate them with his hearing loss. In *King v. Shulkin*, 29 Vet.App. 174, 182 (2017), we noted that, even where the Board erred in determining what an individual rating contemplated, any such error would be harmless where there was no linkage between the alleged complaint and an underlying disability. The same applies here: absent evidence of a link between Mr. Long's anxiety and depression and his underlying hearing loss, he cannot demonstrate error in the Board's determination that such symptoms failed to warrant extraschedular consideration.

### 3. Ear Pain

Likewise, Mr. Long's challenge to the Board's findings regarding ear pain falters due to a lack of linkage between the complaint and his hearing loss. He consistently attributed his ear pain to his use of hearing aids and not to hearing loss. R. at 421. He testified to this effect at his Board hearing. *Id.* And at no point has he shown competent evidence associating his pain with his hearing loss. Without sufficient evidence that the alleged unusual functional impairment is attributed to the underlying service-connected disability, extraschedular consideration is foreclosed.

### B. *Thun*'s Second Step

While our discussion of *Thun*'s first step resolves Mr. Long's allegations, we note that he could not prevail without satisfying *Thun*'s second step: whether the "veteran's disability picture evinces related factors such as marked interference with employment or frequent periods of hospitalization," *Nat'l Org. of Veterans' Advocates, Inc. v. Sec'y of Veterans Affairs*, 927 F.3d 1263, 1265 (Fed. Cir. 2019) (quotes omitted).

10

Mr. Long's brief focused exclusively on *Thun*'s first step, namely whether the diagnostic criteria for hearing loss contemplated the various symptoms and effects he alleged. He did not challenge any findings related to *Thun*'s second step. Failing to raise such a challenge is, as we've said, fatal to his appeal. *See Payne*, 31 Vet.App. at 394. To the extent the veteran may have raised such assertions during oral argument, we decline to exercise our discretion to take up that inquiry in this case. *See Maggitt v. West*, 202 F.3d 1370, 1377–78 (Fed. Cir. 2000). Exercising that discretion requires us to consider factors such as the potential harm to the veteran caused by delaying a ruling or countervailing considerations such as protecting the Agency's administrative authority and promoting judicial efficiency. *Id*. These interests are not at stake here.

### III. CONCLUSION

Accordingly, the Board's March 16, 2016, decision is AFFIRMED.

SCHOELEN, *Senior Judge*, concurring in the judgment and dissenting in part: For the past several years, this Court's extraschedular jurisprudence has been nothing short of disjointed – a veritable grab-bag of concepts and ideas resulting in a never-quite-cohesive outcome. This Court has struggled with an excessive amount of litigation surrounding the proper interpretation and implementation of 38 C.F.R. § 3.321, particularly in the context of hearing loss. *Doucette* and its progeny have done little to illuminate the correct path, and disagreements abound with every new application of facts to the *Thun* framework. This case is no exception. I write separately today to respectfully address, again, the frustration I espoused in *Doucette*, as well as to explain my conclusion that extraschedular referral and awards are simply unavailable for Diagnostic Codes (DCs) without listed symptoms.

### I. Problems with the Majority's Changes to the Basic Extraschedular Framework

In 2007, the *Martinak* Court addressed extraschedular consideration in the context of hearing loss, counseling that medical examiners must elicit "functional effects" information from veterans. *Martinak v. Nicholson*, 21 Vet.App. 447, 455 (2007). "Functional effects" was a term of art used in that case that has persisted ever since, and by requiring examiners to provide functional effects information for hearing loss cases, the Court was unmistakably signaling to

adjudicators that they must take a holistic look at a veteran's disability picture to determine whether the veteran is being adequately compensated:

> The policy of describing the results of all tests conducted makes sense, particularly in the context of the extraschedular rating provision 38 C.F.R. § 3.321(b). Unlike the rating schedule for hearing loss, § 3.321(b) does not rely exclusively on objective test results to determine whether a referral for an extraschedular rating is warranted. The Secretary's policy facilitates such determinations by requiring VA audiologists to provide information in anticipation of its possible application.

*Id.*

The following year, the Court in *Thun* attempted to craft a workable and meaningful framework for the extraschedular referral and assignment process. Step 1 of *Thun* requires VA to compare the severity and symptomatology of a veteran's disability picture to the DC at issue to determine whether the DC is adequate to compensate the veteran. *Thun v. Peake*, 22 Vet.App. 111, 115 (2008). If the DC is inadequate to compensate the veteran, the first element is met, and the adjudicator proceeds to *Thun* step 2, which requires VA to determine whether the veteran's disability is "so exceptional or unusual due to such related factors as marked interference with employment or frequent periods of hospitalization."[3] *Id.* at 115-16. If the second element is also met, the adjudicator is required under *Thun* step 3 to refer the matter to the Director of Compensation Service or his or her delegatee to determine whether an extraschedular rating is warranted. *Id.* at 116. Even with recent regulatory changes, I believe this framework to be sound and well-grounded in the text of the regulation; therefore, it should continue to serve as the bedrock of our extraschedular analysis.

In the case at hand, the majority appears to agree that *Thun* should remain the law of the land; however, their decision recasts *Thun*'s steps – particularly its first step – in an attempt to stem litigation perceived as unnecessary. Notably, the majority appears to replace *Thun*'s step 1 comparison of severity and symptomatology to the DC at issue with a new approach fashioned as a "totality of the factors inquiry rather than as a mechanical formula." *Ante* at 5. Although I agree with the majority in principle that extraschedular consideration requires a holistic approach to

---

[3] Effective January 8, 2018, VA's amendment to § 3.321(b)(1) changed the extraschedular analysis so that it no longer requires consideration of the collective impact of service-connected disabilities. *See* Department of Veterans Affairs, Extra-Schedular Evaluations for Individual Disabilities, 82 Fed. Reg. 57,830 (Dec. 8, 2017). This regulatory change also made minor alterations to language relevant to *Thun* steps 2 and 3. Because I do not believe this change in language has any effect on the substance or structure of the *Thun* analysis, I have inserted the current regulatory language into the *Thun* framework.

determine whether referral is warranted, their reformulation of *Thun* step 1 deviates from past precedent. *Thun* states that "initially, there must be a comparison between the level of severity and symptomatology of the claimant's service-connected disability with the established criteria found in the rating schedule for that disability." 22 Vet.App. at 115. The majority opinion largely subverts this relatively straightforward legal test, instead holding that "[t]his inquiry is not reducible to a mere comparison between symptoms and the diagnostic criteria but requires a reasoned assessment of both the veteran's full disability picture and the capacity of the rating schedule to evaluate such." *Ante* at 5. Of course, the majority is free to change precedent in the context of an en banc case, but it should be clear in its intentions and execution when doing so.

The majority creates an additional and unnecessary complication in its new *Thun* formulation: It finds the term "functional impairment" most relevant to step 1, while the term "functional effects" gets recategorized as relevant only to step 2. Past caselaw has used the terms "symptoms," "functional effects," and "functional impairments" interchangeably, and I see no need to delineate those concepts to shoehorn the DCs that do not list specific symptoms into the *Thun* framework. *See King v. Shulkin*, 29 Vet.App. 174, 180 & n.5 (2017) (continuing *Doucette*'s use of interchangeable terms when comparing the veteran's disability picture to the DC and refusing to address the propriety of doing so). "Impairment" as a term is no clearer in limiting or censoring out the type of issues that veterans, such as Mr. Long, have raised. Mr. Long's ear pain is just as much an impairment as it is an effect. Moreover, suddenly requiring veterans and their advocates to use the magic word "impairment" will further confuse this already confusing area of the law.

Additionally, shifting all functional-effects considerations to *Thun* step 2 undercuts the majority's holistic approach. As stated above, *Martinak* held that examiners must elicit functional effects information so that the Board can ascertain whether a veteran's entire disability picture is exceptional or unusual. But placing functional effects solely under step 2 means that if a veteran displays uncharacteristic severity for his or her disability, as *evidenced* by his or her functional effects, the Board nevertheless is not obligated to compare that level of severity to the DC. In essence, this allows the Board to artificially cut off the *Thun* analysis at step 1 without actually comparing severity to the DC at issue by simply labeling the manifestation of the veteran's disability as an "effect." Through this ideological shift, the Court appears to abdicate its role of interpreting the regulation to the Board, content to allow the Board an "I'll-know-it-when-I-see-it"

13

test regarding *Thun*'s first step that will be effectively unreviewable on appeal. The majority's formulation ultimately results in severity being read out of the application of the regulation.

As support for its position the majority cites *Yancy v. McDonald*, stating that "the first *Thun* element compares a claimant's symptoms to the rating criteria, while the second addresses the resulting effects of those symptoms." 27 Vet.App. 484, 494 (2016); *ante* at 7. But *Yancy*'s step-2 discussion and citations clearly contemplate economic effects, not "functional effects" like the dizziness or ear pain mentioned in *Doucette*. *See Yancy*, 27 Vet.App. at 494 (using the "loss of hypothetical employment advancement opportunities and an inability to work" and "[e]vidence of a claimant's lost income" as examples of "effects" belonging to *Thun* step 2) (citations omitted). Perhaps the majority's interpretation of *Yancy* highlights a schism in the Court's extraschedular jurisprudence, but I find this interpretation to be a novel and flawed interpretation of the post-*Doucette* landscape, and the traditional understanding of *Thun* should not be replaced on this basis.[4]

## II. Limitation of Extraschedular Evaluations

Even if the majority here today applied *Thun* in the way I believe it is traditionally understood, there is a more fundamental and overarching problem with the Court's extraschedular jurisprudence – namely, there is no way for the Board to conduct the *Thun* step-1 analysis for hearing loss or any other condition with a DC that does not list symptoms or explain the basis for its assignment of severity. I first raised this issue in my *Doucette* dissent, wherein I stated that "[b]ecause no symptoms are listed in the rating schedule for hearing loss, there is no way to

---

[4] If I endorsed the majority's *Thun* formulation (which I do not), I would be forced to dissent from the majority's affirmance of Mr. Long's Board decision. Their conclusion regarding the veteran's ear pain requires the Court to fact-find, and I would remand under *Doucette* for the Board to engage in that analysis in the first instance. Notably, this fact-finding regarding Mr. Long's ear pain creates a new and higher bar for a nexus. The reason Mr. Long asserts that he has ear pain is because of hearing aids he must wear because of his service-connected hearing loss. That chain of causation is not too attenuated. Such a stringent requirement is not required by our case law. *See Roper v. Nicholson*, 20 Vet.App. 173 (2006), *aff'd*, 240 F. App'x 422 (Fed. Cir. 2007). Similarly, the majority conducts its own analysis of evidence and arguments regarding whether Mr. Long's alleged psychological symptoms and effects are sufficiently compensable under this Court's recent decision in *Martinez-Bodon v. Wilkie*, 32 Vet.App. 393 (2020), and I would remand for the Board to provide that analysis. However, because I find an extraschedular evaluation unavailable for hearing loss (*see* Section II), I ultimately must concur with the majority's conclusion; nevertheless, I strongly disagree with its logic, particularly regarding Mr. Long's ear pain.

adequately compare the 'level of severity and symptomatology' to the rating criteria as *Thun* requires when determining whether the schedular rating criteria adequately contemplate a veteran's disability picture." 28 Vet.App. 366, 375 (2017) (Schoelen, J., dissenting).

The *Doucette* majority disagreed with that assessment, instead deciding – absent any Board analysis or medical evidence – what types of second-order ("functional") effects were not contemplated by the hearing loss DC. Specifically, the majority affirmatively stated that "the rating criteria for hearing loss contemplate the functional effects of difficulty hearing and understanding speech," but that not all functional effects of hearing loss are contemplated by § 4.85 so that the Board would be required to assess whether the DC contemplates functional effects such as "ear pain, dizziness, recurrent loss of balance, or social isolation due to difficulties communicating." *Id.* at 371. To this day, I still believe it was improper for the Court to determine, as a matter of law, that particular effects of hearing loss were or were not contemplated by the DC. We are ill-situated to determine what medical symptoms, effects, or severities are contemplated by a DC that does not on its face provide any textual evidence for what should be considered part of the disability.

On some level, I understand the *Doucette* Court's inclination to effectively say that "hearing loss is hearing loss, and hearing loss is inherently contemplated by the hearing loss DC," because that is an intuitive observation predicated on information in the Federal Register at the time the regulation was promulgated that purported to explain what was being measured by the hearing tests an examiner is required to perform. *See Doucette*, 28 Vet.App. at 368-69. However, the *Doucette* majority divined what "functional effects" were not contemplated by the DC without relying on any regulatory text or other sources. Moreover, their hearing-loss-is-hearing-loss observation fails to account for *Thun*'s call to compare severity – not just symptomatology – to the rating criteria. As discussed, § 4.85 simply requires mechanical application of outputs from audiometric testing and renders a Roman numeral on a grid to determine the appropriate level of disability compensation. There are no symptoms and nothing by which to judge the severity of a veteran's disability picture. For a veteran to be awarded a 10% disability rating, should that veteran be able to hear someone speaking if the speaker's back is turned? Should a veteran be able to hear a television without having to turn up the volume to an uncomfortable level for others in the room? There is no way for us to know, because the regulation does not explain what level of difficulty hearing is contemplated by a particular Roman numeral.

15

The same problem that exists in the hearing loss DC exists throughout the rating schedule. For instance, the hypertension DC, DC 7101, lists no symptoms or functional effects, but instead assigns disability ratings strictly based on diastolic blood pressure readings. 38 C.F.R. § 4.104, DC 7101 (2020). Although common sense dictates that the DC is inherently meant to contemplate the severity of a veteran's hypertension, I have no way of comparing an individual veteran's manifestations of that hypertension to the Code to determine whether those manifestations are unusual or exceptional, and I find any attempt by the Court to do so to be outside the bounds of the law.

Leaving the matter exclusively to the Board – as the *Doucette* majority seemed to envision – also provides no principled solution, as I believe any attempt by the Board to compare symptoms and functional effects with nonexistent rating criteria forces the Board to make a medical determination, resulting in a *Colvin* violation.

For nearly as long as this Court's doors have been open to veterans, we have held that the Board "must consider only independent medical evidence to support their findings rather than provide their own medical judgment in the guise of a Board opinion." *Colvin v. Derwinski*, 1 Vet.App. 171, 172 (1991), *overruled on other grounds by Hodge v. West*, 155 F.3d 1356 (Fed. Cir. 1998). The heart of this analysis is the need for the Board to provide adequate reasons or bases when interpreting medical facts so as not to substitute its own judgment for that of medical professionals. *See id.* at 175 ("[A]ll medical evidence contrary to the veteran's claim will be made known to him and be a part of the record before this Court.").

This Court has construed *Colvin* violations broadly, encompassing a plethora of ways that the Board substitutes its own judgment for that of medical professionals. *See Frost v. Shulkin*, 29 Vet.App. 131, 141 (2017) (finding a *Colvin* violation when the Board determined the date of onset of the appellant's PTSD absent adequate evidence); *see also Leopoldo v. Brown*, 4 Vet.App. 216, 219 (1993) (finding remand for a *Colvin* violation was warranted when the Board determined the appellant's back condition was etiologically related to a leg disability, absent medical evidence: "As judges, we have no idea how significant, medically speaking, leg length discrepancy might be as to the etiological origins of the appellant's back condition"). For example, in *Kahana v. Shinseki*, this Court found that the Board violated *Colvin* while analyzing a disability claim for an anterior cruciate ligament (ACL) injury:

16

> [T]he Board [made] a medical determination as to the relative severity, common symptomatology, and usual treatment of an ACL injury without citing to any independent medical evidence to corroborate its finding. Indeed, the record is devoid of any medical evidence establishing the relative severity, common symptomatology, and usual treatment of an ACL injury.

24 Vet.App. 428, 434 (2011). The implications of *Colvin* are easily seen in this schedular context: The Board must utilize independent medical evidence to establish relative severity, common symptomatology, and usual treatment of the disability. In the extraschedular context, the Board must weigh similar factual information regarding severity and symptomatology when making an extraschedular decision, as per *Thun*. In both instances (under DCs with listed symptoms), the Board simply compares the severity and symptomatology of the veteran's condition to the criteria in the DC and assigns the appropriate rating. Under an extraschedular analysis for a DC without listed rating criteria, however, the Board takes the medical evidence of record and attempts to compare it to nonexistent symptoms and severities in the DC. Although determining what symptoms or functional effects a veteran displays is a factual determination within the Board's purview, *see King*, 29 Vet.App. at 181 n.6 (refusing to decide "whether determining what qualifies as a functional effect not contemplated by an applicable rating criteria is a question of law or a question of fact," but stating that "the determination of the adequacy of *evidence* demonstrating the presence or absence of functional effects is a question of fact"), forcing the Board to ascertain what is or is not contemplated by a DC devoid of listed rating criteria unmoors the analysis from the regulation and requires them to essentially decide sua sponte what a disability medically entails. That act amounts to a *Colvin* violation.

### III. The Unavailability of Extraschedular Ratings for DCs Without Listed Symptoms

If, then, in the context of extraschedular referral for hearing loss the Board cannot properly apply *Thun* without running afoul of *Colvin*, the only logical conclusion is that we must judicially create an exception to *Thun* that either (1) applies § 3.321 to DCs without listed symptoms in a manner that allows for compliance with *Colvin*, or (2) holds that extraschedular referral is simply unavailable for these types of DCs. As to the first method, creating an alternative framework to *Thun* is inappropriate because it would require the Court to operate outside the bounds of the regulation. The regulation is clear on its face: "The governing norm in these exceptional cases is a finding . . . that application of the regular schedular standards is impractical because the disability

is so exceptional or unusual due to such related factors as marked interference with employment or frequent periods of hospitalization." 38 C.F.R. § 3.321(b). *Thun*'s pronouncement, that "initially, there must be a comparison between the level of severity and symptomatology of the claimant's service-connected disability with the established criteria found in the rating schedule for that disability," 22 Vet.App. at 115, still holds weight because it is a straightforward application of the regulatory text.

It is my belief, therefore, that the en banc Court should take the second approach: Accept *Thun* as good law based on the regulation; hold that extraschedular evaluations are unavailable for DCs that require mechanical applications of test results and are devoid of listed criteria; and overrule any other conflicts in our previous jurisprudence – including *Martinak*, to the extent that it endorses the idea that extraschedular ratings are available for hearing loss.[5]

As applied to the case at hand, the Board's decision would be based on an incorrect theory of law; however, because an extraschedular evaluation would be unavailable for hearing loss, I would find it harmless error. *See* 38 U.S.C. § 7261(b)(2) (requiring the Court to "take due account of the rule of prejudicial error"); *Shinseki v. Sanders*, 556 U.S. 396, 409 (2009) (holding that the harmless-error analysis applies to the Court's review of Board decisions and that the burden is on the appellant to show that he or she suffered prejudice as a result of VA error). Therefore, I believe that the Board's decision should be affirmed.[6]

---

[5] I do not reach this conclusion lightly. I do not believe veterans or the system are well served by determining that significant regulatory provisions lie beyond the review of this Court or that certain disabilities are more worthy of extraschedular evaluations. However, I believe that creating this type of exception to the *Thun* framework for these types of DCs is the only way to prevent the Board from making prohibited medical determinations. Although these regulations appear highly objective because of their mechanical application of set criteria, through their silence of specific symptoms they negate a veteran's right to be fully compensated for his or her disability picture. These DCs ignore the very nature of extraschedular evaluations, which require listed symptoms and disability levels with which to compare the veteran's symptomatology and severity. I would urge VA to write more comprehensive regulations that encompass objective criteria as well as specific symptoms, such as the DCs for diabetes mellitus. *See* 38 C.F.R. § 4.119, DC 7913 (stating that for a 100% disability rating, the veteran must show "more than one daily injection of insulin, restricted diet, and regulation of activities (avoidance of strenuous occupational and recreational activities) with episodes of ketoacidosis or hypoglycemic reactions requiring at least three hospitalizations per year or weekly visits to a diabetic care provider, plus either progressive loss of weight and strength or complications that would be compensable if separately evaluated").

[6] Lastly, I recognize that this goes a step or more beyond the conclusion I reached in *Doucette*. After witnessing years of endless remands for poor reasons or bases and a general inability of the Board and the Court to review these cases, I see this evolution in philosophy as the natural and logical endpoint in the debacle that has been extraschedular analysis, with fidelity to the regulation and to this Court's foundational case of *Colvin* being of paramount importance. But again, I sincerely hope that VA remedies this impasse by drafting more comprehensive regulations.

MEREDITH, *Judge*, with whom GREENBERG and ALLEN, *Judges*, join, dissenting: Because we believe the majority reaches farther than necessary in this case, acts as the fact-finder rather than reviewer in affirming the decision on appeal, and does not offer clear guidance on the issue it purports to settle, we respectfully dissent.

First, as the majority recognizes, the Court's decision in *Morgan v. Wilkie* was clear: "[E]xtraschedular consideration is appropriate *only after* the agency has exhausted *all other tools* for a disability rating, whether direct, secondary, or analogous ratings." *Ante* at 6 (citing *Morgan*, 31 Vet.App. 162, 168 (2019) (emphasis added)). Here, the issue before the Board of Veterans' Appeals (Board) in March 2016 was "[w]hether referral for extraschedular consideration of the claim of entitlement to an initial compensable rating for the service-connected bilateral hearing loss disability is warranted." Record (R.) at 2. In considering that question, the Board noted that the appellant purported to identify "favorable evidence demonstrating severe functional effects of his hearing loss[,] including . . . interference with his ability to work with his students, including writ[ing] lesson plans and preparing for classes."[7] R. at 6. On appeal, the appellant also asserts that the Board failed to adequately address evidence that he experiences ear pain as a result of his hearing aids and has difficulty with confidence/self-esteem and with his teaching duties due to his hearing loss. Appellant's Br. at 8; Reply Br. at 4; *see* R. at 420-21, 428.

There is no dispute that the Board did not consider whether there are potential schedular rating alternatives for these difficulties. *See* R. at 6-9. Because that "threshold analysis" must precede any consideration of extraschedular evaluations "when possible schedular alternatives for rating a disability are either raised by the claimant or reasonably raised by the record," *Morgan*, 31 Vet.App. at 168, *see ante* at 6, we would remand for the Board to provide that analysis in the first instance.[8] More importantly, because, under *Morgan*, the Board's extraschedular analysis may

---

[7] The Board acknowledged that the appellant also alleged that his anxiety and depression were related to his hearing loss. R. at 6. However, our analysis excludes consideration of those difficulties because the Board found, and the appellant does not dispute, that those conditions are not related to any service-connected disability. R. at 7; *see* Appellant's Brief (Br.) at 10; Reply Br. at 3-4. Thus, there is no need for the Board or the Court to discuss whether additional schedular or extraschedular options exist to account for those manifestations. Accordingly, we believe the majority's discussion of the merits of the allegations raised to the Board as to anxiety and depression goes farther than necessary. We also note that, in its discussion, the majority assumes without explanation that the fifth edition of the *Diagnostic and Statistical Manual of Mental Disorders* is applicable to the appellant's case. *See ante* at 7, 9-10. *But see* 79 Fed. Reg. 45093, 45094 (Aug. 4, 2014).

[8] Although we do not opine as to whether the appellant could be compensated for these difficulties through schedular tools, we cannot conclude that no harm resulted from bypassing that analysis given the evidence that those difficulties caused work-related challenges. *See* 38 C.F.R. § 4.1 (2020) (explaining that the rating schedule

now be considered premature where it occurs prior to the consideration of schedular alternatives, we would similarly conclude that it is premature for the Court to opine on the propriety of the Board's denial of referral for extraschedular consideration for this particular veteran and, more so, to generally reexamine the Court's caselaw on the extraschedular framework based on the facts of this case. Indeed, the majority's statement in the introduction to the opinion that the Board decision is affirmed "because the symptomatology [t]he [appellant] presents is not exceptional as it is readily capable of evaluation under the relevant diagnostic criteria and available rating tools,"[9] *ante* at 1-2, signals clearly that the extraschedular discussion that follows is unnecessary and amounts to an advisory opinion.[10] *See Barnett v. Wilkie*, 32 Vet.App. 83, 87 (2019) (citing *Waterhouse v. Principi*, 3 Vet.App. 473, 474 (1992) (holding that, absent the ability to redress an injury through a favorable decision, any act by the Court would be "'gratuitous'" (quoting *Simon v. Eastern Kentucky Welfare Rights Org.*, 426 U.S. 26, 38 (1976))).

Second, even if a remand under *Morgan* is not the appropriate action and the extraschedular framework is ripe for the Court's review, we would nevertheless conclude that remand is warranted. In that regard, the majority purports to lay out a revised framework for assessing the issue of extraschedular consideration, but the Board did not make the predicate factual findings necessary to apply that framework. Accordingly, the matter should be remanded for the Board to do so in the first instance. *See Deloach v. Shinseki*, 704 F.3d 1370, 1380 (Fed. Cir. 2013) ("[T]he evaluation and weighing of evidence are factual determinations committed to the discretion of the factfinder—in this case, the Board."); *Hensley v. West*, 212 F.3d 1255, 1263 (Fed. Cir. 2000) ("[A]ppellate tribunals are not appropriate fora for initial fact finding."); *see also Washington v. Nicholson*, 19 Vet.App. 362, 369 (2005); *Owens v. Brown*, 7 Vet.App. 429, 433 (1995). To

---

compensates for impairment in earning capacity); *see also* 38 U.S.C. § 7261(b)(2) (requiring the Court to "take due account of the rule of prejudicial error").

[9] The majority does not explain why it would be appropriate to affirm on a different basis than that on which the Board decision rests. *See Sec. Exch. Comm'n v. Chenery Corp.*, 332 U.S. 194, 196 (1947) ("[A] reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency.").

[10] Notably, the majority appears to acknowledge that its discussion of the first step of *Thun v. Peake*, 22 Vet.App. 111, 115 (2008), *aff'd sub nom. Thun v. Shinseki*, 572 F.3d 1366 (Fed. Cir. 2009), is dicta by characterizing its recitation of potentially relevant factors as "guidance," *ante* at 6, and by acknowledging that the appellant's failure to challenge *Thun* step two is "fatal to his appeal," *ante* at 11.

proceed otherwise under these circumstances would require the Court to engage in rather extensive fact-finding, as the majority has done here, *ante* at 9-10, and usurp the role of the Board.[11]

Third, although the majority attempts to synthesize the major caselaw pertaining to the extraschedular framework and announce clear rules governing that framework—a difficult undertaking, to be sure—the decision ultimately provides little clarity because it requires consideration of new and perhaps inapt terminology, imposes an additional burden that does not seem to align with the way in which disabilities are generally rated, and appears to overrule several precedential decisions without saying so.[12] For example, the majority introduces the term "functional impairments" into this realm and then offers it as a synonym for "symptom." *Compare ante* at 6 ("[F]unctional impairments serve as the operative focus of *Thun*'s first step."), *with ante* at 5 ("*Thun*'s first step centers on . . . the full symptomatology . . . ."). But, the usual meaning of symptom is "any subjective evidence of a disease or of a patient's condition, i.e., such evidence as perceived by the patient; a noticeable change in a patient's condition indicative of some bodily or mental state."[13] Dorland's at 1816-17; *see Perrin v. United States*, 444 U.S. 37, 42 (1979) ("[U]nless otherwise defined, words will be interpreted as taking their ordinary, contemporary,

---

[11] For instance, although the majority purports to review "the Board's findings regarding ear pain," *ante* at 10, the Board made no such findings, *see* R. at 2-9. Rather, the majority, in applying its new framework, finds in the first instance that there is no "linkage between the complaint [of ear pain] and [the appellant's] hearing loss" because he "consistently attributed his ear pain to his use of hearing aids and not to hearing loss." *Ante* at 10. Aside from the majority's disregard for the Court's role as reviewer rather than fact-finder, we question a finding that ear pain caused by hearing aids is not related to the hearing loss that necessitates the use of such assistive devices.

[12] We further note that the majority's characterization of the holding in *Doucette v. Shulkin*, 28 Vet.App. 366 (2017), may lead to additional confusion in the extraschedular realm. For example, the majority states that the Court in *Doucette* "held that the rating criteria for hearing loss contemplated symptomatology (i.e., the full range of symptoms) related to decreased hearing even though the diagnostic code failed to list any symptoms but relied solely on audiometric tests." *Ante* at 4. But the holding in *Doucette* was more narrow: "[T]he rating criteria for hearing loss contemplate the functional effects of decreased hearing and difficulty understanding speech in an everyday work environment." 28 Vet.App. at 369. In other words, the only "symptom" of hearing loss contemplated by the rating schedule is difficulty hearing. Moreover, the majority states that, in *Doucette*, "rather than engaging in a line-item accounting of each symptom and effect as compared to the diagnostic criteria, we based our ruling on the common-sense observation that a diagnostic code designed to assess hearing loss necessarily contemplates those symptoms and effects commonly associated with such." *Ante* at 5. But, the question in *Doucette* was whether there *were* any diagnostic criteria other than hearing loss (i.e., difficulty hearing), so there was nothing in the rating schedule to compare the appellant's symptoms against.

[13] We recognize that the medical definition of "symptom" is not entirely sufficient to capture the way in which the Court has used that word in the extraschedular context. As noted above, the word "symptom," medically speaking, captures the subjective aspect of evidence of disease; by contrast, the word "sign" is medically defined as "an indication of the existence of something: any objective evidence of a disease, i.e., such evidence as is perceptible to the examining physician, as opposed to the subjective sensations (symptoms) of the patient." DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1708 (32d ed. 2012) [hereinafter DORLAND'S]. We generally understand the Court's use of the word "symptoms" to include both objective and subjective evidence of a particular condition.

common meaning."); *Nielson v. Shinseki*, 23 Vet.App. 56, 59 (2009) ("It is commonplace to consult dictionaries to ascertain a term's ordinary meaning."). And, under the heading "[f]unctional impairment," a VA regulation explains that "[t]he basis of disability evaluations is the ability of the body as a whole, or of the psyche, or of a system or organ of the body to function under the ordinary conditions of daily life including employment," 38 C.F.R. § 4.10 (2020). In light of these definitions, it is unclear to us on what basis the word "symptom" could be a substitute for the term "impairment" or "functional impairment."

Further, the term "disability" in 38 U.S.C. § 1110 "refers to the functional impairment *of earning capacity*, not the underlying cause of said disability." *Saunders v. Wilkie*, 886 F.3d 1356, 1363 (Fed. Cir. 2018) (emphasis added). It is thus similarly unclear to us how "functional impairment of earning capacity," *id.*—literally, the *effect* of the body's inability to function on the veteran's earning capacity—could also mean "evidence of a disease," Dorland's at 1708, 1816-17. In sum, we are concerned that the language the majority offers to govern the extraschedular analysis may lead to confusion in applying the revised framework.

Additionally, in introducing the requirement that "[extraschedular] consideration is not warranted for downstream effects that clearly lack *a requisite and legally recognized nexus* to service or to a service-connected disability," *ante* at 7 (emphasis added), the majority appears to place a new burden on claimants[14] and does not address whether medical evidence would generally be required to make such a nexus determination. If so, the majority's framework may result in additional burden on VA and further delay for claimants while VA obtains such a medical opinion.

Finally, the majority's holding that the inquiry into whether a claimant's disability picture is exceptional or unusual "is not reducible to a mere comparison between symptoms and the diagnostic criteria," *ante* at 5, could be read as implicitly overruling Court decisions that have suggested that the inquiry is as simple as that. *See, e.g.*, *King v. Shulkin*, 29 Vet.App. 174, 179 (2017) ("This first element requires the Board to do nothing more than compare a veteran's specific symptoms and their severity with those contemplated by the plain language of the rating schedule. . . . [T]he components to be considered in the first step are clear: symptoms and their severity on the one hand and the plain language of the schedular criteria on the other."); *Yancy v.*

_____

[14] It is unclear on what basis the Court could impose a new nexus requirement after service connection has already been established and the only question is whether the service-connected condition is so exceptional that a higher rating is warranted. *Cf.* 38 U.S.C. § 1110.

*McDonald*, 27 Vet.App. 484, 494 (2016) ("Essentially, the first *Thun* element compares a claimant's symptoms to the rating criteria, while the second addresses the resulting effects of those symptoms."); *Thun*, 22 Vet.App. at 115 ("[I]nitially, there must be a comparison between the level of severity and symptomatology of the claimant's service-connected disability with the established criteria found in the rating schedule for that disability."). In sum, we are concerned that the majority's unclear treatment of prior precedent may lead to confusion at both the agency and Court level.

For these reasons, we respectfully dissent.